UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                  :   **OPINION AND ORDER**

SECURITIES AND EXCHANGE,   :
COMMISSION,   :
                        Plaintiff,   :
                                                  :
        - against -   :
                                                  :   01 Civ. 11282 (AKH)

YEHUDA SHIV, SAGAM CAPITAL   :
MANAGEMENT CORP. and SAGAM   :
CAPITAL LLC,   :
                       Defendants.   :
-------------------------------------------------------X

ALVIN K. HELLERSTEIN, UNITED STATES DISTRICT JUDGE:

        The Securities and Exchange Commission ("SEC") brought this lawsuit to stop a massive securities fraud perpetrated by Yehuda Shiv and the companies he controlled, to identify and freeze the funds he despoiled, and to repatriate such funds to their owners. The SEC filed suit on December 10, 2001, and obtained preliminary and, ultimately, final injunctive and equitable relief, including a Receiver to receive and repatriate the funds that Shiv had despoiled. The Receiver, after thorough investigations, now moves to unwind the tangled accounts of Shiv's frauds and to distribute the funds thus freed to those having rightful claim to them.

        The central issue now before me is the status of Bank Julius Baer, as lien holder. As the facts uncovered and alleged by the Receiver show, the funds advanced by Bank Julius Baer ("BJB"), as loans to certain of Shiv's customers secured by Shiv's pledges of accounts of other of his customers, enabled Shiv to create a fiction of profits to cover over heavy actual losses in the customers' accounts he managed. The Receiver, in seeking to recapture funds thus fraudulently transferred, contends that BJB is not entitled to the status of lien holder in good faith, and argues that he has standing, and that the

1

district court has jurisdiction, to regulate BJB's liens, incident to his duty to seek, and recapture, the fruits of the securities fraud that Shiv perpetrated.

The objecting party, BJB, focuses on the issue of the Receiver's plan to repatriate funds. BJB argues that the SEC's standing, and this court's jurisdiction, extend to stopping wrongdoers' securities frauds and causing disgorgement of wrongful profits, not to championing some creditors' claims against other creditors. Hence, it argues, the court lacks jurisdiction to fix priorities among creditors, or to adjudicate liens it holds against creditors.

I hold that the court has jurisdiction, and the Receiver has standing, to trace fraudulently taken funds to where they have come to rest or, if liens are asserted, to regulate the lien holder's right to appropriate such fraudulently taken funds.

**I. FACTS**

*A. Shiv and the Sagam Entities*

Yehuda Shiv and his investment companies, Sagam Capital Management and Sagam Capital LLC (the "Sagam Entities"), provided investment advisory services to wealthy individuals, mainly non-citizens of the United States. Typically, Shiv formed a Panamanian or British Virgin Island corporation to become the owner of record of an account, arranged for the client to deposit the funds to be invested in the corporation's accounts at BJB, and organized the corporations so that persons close to Shiv, who would follow his instructions and control their activities, would be in charge of the corporations.

Shiv or the Sagam entities was also given a power of attorney, typically by the corporation nominally owning the funds at BJB. Twelve of the accounts granted Shiv or

the Sagam Entities a general power of attorney, nineteen gave a more limited power of attorney. The general powers of attorney generally authorized Shiv to withdraw funds from, or to pledge a client's account, and the limited power of attorney qualified Shiv's power only for the purposes of withdrawing funds, making investments or liquidating losses.

B. *Shiv's Investment Strategies and Their Consequence*

Starting in the mid-1980s, Shiv implemented an investment strategy that utilized foreign currency loans and the purchase and sale of mortgage-backed securities. For their investment advisory services, the Sagam Entities were entitled to two types of commissions: (a) two percent per year payable quarterly on the net asset value of the client's account and (b) twenty percent of profits in excess of ten percent generated each year. BJB was paid a commission for arranging the foreign currency loans and the mortgage-backed securities sales. In many cases, Shiv used his power of attorney to give BJB special mailing instructions whereby monthly account statements would be sent to the Sagam Entities instead of the account owner. Shiv, to cover up losses, would then create false statements and send those to the clients.

In early years, Shiv's strategy produced substantial returns for his clients. In 1994, however, the market changed, with disastrous results for Shiv and his clients. Shiv tried to cover up these losses by sending his clients false monthly account statements that he created showing his clients a steady growth in investments when in fact substantial losses had occurred. Shiv continued to charge the clients his two and twenty percent fees based on these inflated account balances.

*C. Bank Julius Baer Involvement*

Shiv and the Sagam Entities were one of the largest domestic customers of BJB. Shiv shared office space with BJB; they mutually marketed each other's clients; and they acted as co-managers of the Triumph Fund, an open-ended investment company incorporated in the Cayman Islands whose voting shares were owned either directly by Menachem Ivcher, a Shiv client, or by a Sagam Entity, with Ivcher having the power to vote Sagam's shares. The Receiver alleges that BJB knew of Shiv's investment strategy and that it was causing substantial losses for his clients, that it was aware that he was charging his clients management fees based on non-existent assets, and that it permitted Shiv to transfer funds in BJB into and out of his clients' accounts and into the Sagam Entities' accounts. BJB thus continued to earn substantial fees on Shiv's trading activities, and its loans enabled Shiv to transfer funds from one client to another, to BJB's profit and to enable Shiv to cover up the fraud he was perpetrating.

*D. The Involvement of Menachem Ivcher and the Menachem Ivcher Controlled Companies*

According to the Receiver's report of his investigations, Menachem Ivcher was a major customer of BJB, and he and his companies had a substantial borrowing relationship with the Bank. Menachem Ivcher also was a major factor in Shiv's activities. He extended substantial financing to Shiv and the Sagam Entities, and at various times he, his companies, and/or his daughter Jenny, were shareholders, directors, or had other involvements with one or more of the Sagam Entities.[1] Shiv, at various

---

[1] The Receiver has recently filed a related action, <u>Steinberg v. Ivcher, et al.</u>, 05 Civ. 5482 (AKH), to pursue specific claims against the Ivchers.

times, acted as investment manager for Menachem Ivcher and for entities controlled by Menachem Ivcher, for example, Sydney Plastics, Inc. ("Sydney") and Eclectic Holdings, Inc. ("Eclectic")[2]. Shiv's son, Sagiv Shiv, worked for Sydney as its chief financial officer.

During the 1990s, BJB made loans to Menachem Ivcher and his companies which at various times exceeded $25 million. In the latter 1990s, Menachem Ivcher's withdrawals from his BJB accounts to pay for substantial business and trading losses (presumably incurred as a result of trades effected by Shiv as the account's investment manager) exhausted his borrowing capacity. In 1998, BJB refused to extend additional loans. Shiv then pledged the Sagam Entities' accounts and, when those funds were not enough, used his power of attorney to pledge accounts of other of his customers without their authority, to support further lending by BJB to Menachem Ivcher and his companies. Shiv pledged the accounts of Menachem Ivcher's brother, Baruch Ivcher, and of companies controlled by Baruch Ivcher, particularly the accounts of Waxfield Ltd.,[3] to support BJB's loans to Menachem Ivcher and Menachem's controlled companies. The BJB statements for Waxfield did not show these pledges, nor that Shiv made them for the benefit of Menachem Ivcher, and Menachem Ivcher's companies, Eclectic and Sydney.

As the Receiver reports, when Menachem Ivcher's losses kept growing, Shiv used his powers of attorney to transfer funds from the accounts of other of his clients in BJB to accounts in BJB controlled by Menachem Ivcher. Shiv pledged the account of Crandon

---

[2] Eclectic was formerly known as Jeda Corp.
[3] Waxfield was formerly known as "Rutland Enterprises A.V.V."

Park S.A. ("Crandon"), a company of an associate of Menachem Ivcher, allegedly without the authority of Crandon's principal and, when that was not enough, Shiv pledged accounts of other of his clients. BJB, on the strength of those pledges, advanced additional funds to Menachem Ivcher and his companies. The Receiver alleges that BJB knew that Shiv lacked authority so to pledge one customer's account for another's borrowing, but accepted the pledges and advanced the funds to enable Shiv to continue his trading and his profits and, in course of that activity, adding to the profits of the Bank.

In 1996, Productos Paraiso Del Peru S.A. ("Productos"), a company affiliated with Baruch Ivcher, borrowed approximately $6 million from BJB. Shiv pledged Waxfield's account to support that loan as well. Waxfield, which is separately represented in this lawsuit, alleges that Shiv had no authority to pledge its accounts to BJB, and that BJB knew that Shiv lacked that authority, to support loans by BJB to Productos—or any person or entity other than Waxfield itself.

Because of Shiv's undisclosed pledges of the Waxfield account to BJB, the account lost borrowing capacity to accommodate its own need for funds to cover its own trading losses. Shiv created capacity by shifting funds from other of his controlled clients' accounts to the Waxfield account, and BJB made those transfers on the strength of the powers of attorney filed with BJB by Shiv. In particular, funds from accounts in the names of Skilled and BBCFD were used to transfer funds to the Waxfield account. Shiv also transferred funds from the Skilled and BBCFD accounts into an account for the benefit of another of Shiv's customers, an account with the name Exceed, also to hide trading losses and give the appearance of continued profitability.[4]

---

[4] Since the filing of the motion, Exeed and Skilled have settled their claims.

In sum, BJB, according to the Receiver's report, transferred funds into and out of various accounts controlled by Shiv, on the strength of powers of attorney filed by Shiv with BJB, enabling Shiv to continue and enlarge his frauds to their mutual benefit.

*E. The Preliminary Injunction and the Receiver*

A criminal proceeding was brought against Shiv, and on February 28, 2003, he pleaded guilty to two counts of securities fraud. On motion of the SEC on December 10, 2001, this Court granted a preliminary injunction ("Injunction Order") which froze all accounts at BJB that had been at any time in the possession, custody or under the control of Shiv or the Sagam Entities, and appointed a Receiver, Arthur Steinberg.[5] Sixty-one frozen accounts thus became part of the Receivership Estate. The Receiver conducted a thorough investigation of his clients' accounts, using a law firm, forensic accountants and financial advisors for assistance.

During the course of the Receivership Proceeding, based on the Receiver's investigations and recommendations, thirty-nine accounts were unfrozen and released and transferred to their owners. With the approval of the SEC and the Court, the Receiver reached an agreement with Shiv and his wife, and they turned over their assets to the Receivership Estate.[6] Of the remaining accounts in the Receivership Estate, seven are accounts of the Sagam Entities or were otherwise transferred to the Receivership Estate

---

[5] The accounts frozen at BJB have been transferred to Citibank, N.A. pursuant to my order of March 10, 2005 to avoid any potential problems relating to the acquisition of BJB's North American wealth management operations by the Swiss Bank UBS AG.

[6] Shiv died while incarcerated.

7

pursuant to the Shiv Settlement, four are not at issue in this Motion, and sixteen accounts (the "Misreported Accounts") are involved in this proceeding.

The Receiver now brings two motions before this Court.[7] The first, styled the "Unwind Motion," seeks to unfreeze the misreported accounts and reverse improper transfers made by Shiv from one to another of his clients' accounts, to mask the fraud he was perpetrating. In the second, the "Equitable Distribution Motion," the Receiver asks this Court to adopt his equitable, essentially pro rata, plan of distribution. Under this plan, the Receiver would distribute the funds to the original holders, "ahead" of any liens that BJB purports to hold on the various accounts.

Crandon Park and Waxfield object to the substance of the Receiver's proposed relief and ask the Court to grant affirmative relief to them beyond the recommendations of the Receiver. BJB objects to the Unwind Motion on jurisdictional grounds, contending that the Court lacks jurisdiction and the Receiver lacks standing to adjudicate claims by and against creditors.

The Receiver's Unwind Motion is not ripe for decision. The facts are complicated, and the extent of comments and objections among creditors is not clear. Furthermore, there is a basic threshold issue: to what extent, if any, should the lien status of BJB be recognized? Was BJB a participant with Shiv, disentitling it to recover, or was BJB a lender in good faith, entitling it to its secured portion?

This is the issue to which I turn in the discussion of applicable law that follows.

---

[7] Several of the creditors have also filed suits in the New York Supreme Court against Shiv, BJB, Menachem Ivcher, and other of the creditors.

## II.  THE COURT'S JURISDICTION AND THE RECEIVER'S STANDING

The Securities Exchange Commission was established by the Securities Exchange Act to regulate the national securities markets.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976) (citing H.R.Rep. No. 73-85, at 1-5 (1933)).  Among the most effective and most enduring reforms to prevent a recurrence of the evils that led to the Great Depression, it was given full delegated powers to obtain court injunctions to stop frauds and end violations of the Act.  Section 21(d) of the Securities and Exchange Act, 15 U.S.C. § 78u(d)(1) (2004), empowers the Commission to institute proceedings "[w]henever it shall appear . . . that any person is engaged or is about to engage in acts or practices constituting a violation of any provision" of the Exchange Act.  Id.  The United States District Courts were given jurisdiction to entertain such proceedings and, as appropriate, "to enjoin such acts or practices" and to "grant any equitable relief that may be appropriate or necessary for the benefit of investors."  Securities and Exchange Act, 15 U.S.C. § 78u(d)(5).

Pursuant to Section 21(d) of the Act and at the request of the SEC, the court appointed Arthur Steinberg Receiver of the business and assets of defendants Shiv, his estate, and his controlled entities (the "Sagam Entities").   At stake here is approximately $9.70 million which continue to be entangled, encumbered by liens in favor of BJB and claims asserted by other of Shiv's claimants.  The Receiver proposes to unwind these remaining funds from accounts in which he claims they do not belong, and repatriate these funds to accounts from which Shiv, with BJB's alleged involvement, wrongfully removed them.  BJB opposes, claiming lack of jurisdiction in this court and

lack of standing on the part of the Receiver. Other claimants, although not contesting jurisdiction, also object.

I hold, in the discussion that follows, that this court has jurisdiction, and the Receiver has standing, to trace defrauded funds to where they have come to rest, or to whom they are liened, and to cause them to be disgorged to the extent that the holder lacks rightful claim to such funds.

A. *Subject Matter Jurisdiction*

The Supreme Court has interpreted the language of Securities Act of 1933, 15 U.S.C § 77a, as giving broad authority to district courts to grant equitable relief.[8] Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940). Deckert involved two corporations, Independence Shares Corp. and The Pennsylvania Company. The plaintiffs had sued Independence alleging various claims under the Securities Act. Plaintiffs bought Contract Certificates from Independence under which the holders made installment payments to Pennsylvania. Pennsylvania then bought shares of Independence for the benefit of the certificate holders. At the time of the lawsuit, Independence was insolvent, and so the plaintiffs sought to recover funds from Pennsylvania, even though Pennsylvania was not accused of wrongdoing. Independence was the only defendant and was the only party accused of wrongdoing.

The Court held that the plaintiffs had stated a cause of action entitling them to obtain equitable relief from Pennsylvania, even though Pennsylvania was not directly a

---

[8] The Securities Act of 1933, 15 U.S.C. § 77a was also a basis for jurisdiction under the Injunction Order in this case. Its language is identical to that of the Exchange Act, and Deckert has been applied to both the Securities Act and to the Exchange Act. Adelman v. CGS Scientific Corp., 332 F. Supp. 137, 145 (E.D. Pa., 1971).

party. Justice Murphy declared that "the power to enforce implies the power to make effective the right of recovery afforded by the Act." Deckert, 311 U.S. at 288. Deckert establishes the power of District Courts to craft remedies involving non-parties and non-violators because "this power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the exigencies of the particular case." Id.

The jurisdiction of the district courts to hear claims by receivers appointed under federal law "has long been recognized." Tcherepnin v. Franz, 485 F.2d 1251, 1255 (7th Cir. 1973). "So long as an action commenced by a court appointed receiver seeks 'to accomplish the ends sought and directed by the suit in which the appointment was made, such action or suit is regarded as ancillary so far as the jurisdiction of the . . . court[s] of the United States [are] concerned.'" Id. at 1255-56 (quoting Pope v. Louisville, New Albany & Chicago Ry. Co., 173 U.S. 573, 577 n.5 (1899)). In Tcherepnin, the court appointed a receiver to trace and restore funds and assets that defendants had diverted, to create a fund from which fraud victims could be compensated. Therefore, the suits that the receiver brought against those who improperly were enriched by such diversions were within the ends for which his appointment was made.

The Seventh Circuit then elaborated on its ruling regarding the powers of a receiver in two more cases. In Scholes v. Lehman, 56 F.3d 750 (7th Cir. 1995), the Securities and Exchange Commission sued to enjoin a Ponzi scheme by which defendant Michael Douglas, and corporations he had created, attracted investors for commodity investments. A receiver was appointed to recover the assets that Douglas had diverted from the corporations in which he had invested, and the receiver sought recovery from

11

the transferees of those funds: Douglas' former wife and her current husband, an investor who made money from Douglas' scheme, and five religious corporations.  The Court of Appeals held that it had ancillary jurisdiction (now supplementary jurisdiction, 28 U.S.C. § 1367) over such suit, and that the receiver had standing to recover funds diverted from the corporations, even though the ultimate beneficiaries of his recovery would be the creditors who had been fraudulently induced to invest in those corporations.  The court reasoned:

> "The . . . transfers removed assets from the corporations for an unauthorized purpose and by doing so injured the corporations. . . .[T]he wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors. . . . The corporations were no more than Douglas's evil zombies.  Freed from his spell they became entitled to the return of the moneys – for the benefit not of Douglas but of innocent investors – that Douglas had made the corporations divert to unauthorized purposes.  That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets.  The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims."  Id. at 754-55.

Judge Posner revisited the issue of a receiver's standing in Troelstrup v. Index Futures Group, 130 F.3d 1274 (7th Cir. 1997).  In Troelstrup, the Commodity Futures Trading Commission ("CFTC") brought a suit against a trader, John Tobin, for having defrauded investors under the Commodity Exchange Act.  As in Scholes v. Lehman, the district court appointed a receiver to marshal Tobin's assets for the benefit of those whom he had defrauded.  The issue was whether or not the receiver had standing to sue a commodities merchant, Index Futures Group ("Index"), with whom Tobin had deposited some of the investments he had wrongfully procured.  The receiver alleged that Index was negligent in allowing Tobin to have control over the account, and thus became an agent of Tobin's wrongdoing.  The Court of Appeals held that the district court's

12

jurisdiction was "secure" to appoint a receiver and over the third-party claims brought by the receiver.  Id. at 1277.   However, the receiver lacked standing to sue Index Futures Group because Index was sued, not because it had been a participant in the fraud, or because fraudulently taken money had been diverted to it, but because it was allegedly negligent, not to the party that was the vehicle of the fraud, but to its creditors.  A receiver, the court held, did not have standing to assert the claims of creditors.

In SEC v. Credit Bancorp, Ltd., 290 F.3d 80 (2d Cir. 2002), approximately 200 investors in Credit Bancorp invested in what they thought was a bank-to-bank arbitrage scheme in relation to foreign currency, for an assured high rate of return and a source of margin credit.  In truth, Credit Bancorp and its officials had created a Ponzi scheme, to use proceeds from late investments to give returns to, and redeem investments of, earlier investors.  To accomplish the fraud, Credit Bancorp arranged a line of credit from a partnership (SECO), and a public company (Vintage Petroleum) both controlled by the same person, Charles C. Stephenson, Jr., and pledged eight million shares of the stock of Vintage Petroleum as security in a trust that Credit Bancorp created for the beneficial ownership of itself and SECO.

Credit Bancorp immediately took control of the eight million shares, and diverted the shares into four accounts in different stockbrokerage firms, commingling them with investors' assets.  Credit Bancorp then used the shares again as a second secured credit facility, enabling it to engage in speculative currency and options trading, shifting investors' funds and securities regularly among brokerage accounts, without earmarking or segregating investors' entitlements or accounts until the funds were lost.  In two years, the Ponzi scheme unraveled, resulting in an SEC-initiated lawsuit and a

freeze order. The court appointed a receiver to investigate and trace the movements of funds and assets.

SECO, claiming it had been defrauded of the shares it owned, proposed a plan of distribution providing that the eight million shares of Vintage Petroleum would be returned to SECO ahead of distributions to the defrauded investors. The SEC objected, and proposed a plan providing for the sale of the shares, and ratable distribution to SECO and the investors in proportion to their losses. The receiver presented a compromise, proposing to return the shares to SECO as part of a ratable distribution, the value of the shares being counted for their dollar equivalent, with cash being paid to the investors in proportion to their losses. SECO objected, as did the trustee appointed by Credit Bancorp.

The Court of Appeals upheld the Receiver's plan as a proper exercise of his equitable power to implement the freeze order issued by the District Court in response to the SEC's motion. Applying New York law, the Court of Appeals found that Credit Bancorp held the assets it had acquired in a constructive trust for the benefit of all those who were defrauded, both SECO and the investors. Applying federal insolvency law, the Court of Appeals held that "the law of federal equity receivership applies," and it upheld "the equitable authority of the District Court to treat all the fraud victims alike (in proportion to their investments) and order a pro rata distribution of assets." Id. at 88-89, 90. The Court of Appeals further noted that "the funds of the defrauded victims were commingled and . . . victims were similarly situated with respect to their relationship to the defrauders." Thus, the Court of Appeals affirmed the District Court's approval of the receiver's compromise plan.

The Second Circuit, like the Seventh Circuit, therefore extended the Receiver's equity jurisdiction to trace and repatriate funds from many discrete accounts, through an entity from which the funds had been diverted, back to the rightful owners, ratably in proportion to their losses. This, the Court of Appeals held, was a proper exercise of discretion to implement the SEC's authority to obtain an order from a District Court to enjoin fraud, freeze accounts that are the instrumentalities of fraud, and repatriate funds on a ratable basis to defrauded claimants. If, as happens, adverse claims to priority of return have to be adjudicated – for example, SECO's claims in Credit Bancorp, and BJB's claims in the case before me – the District Court has ample power to do that. See, also, SEC v. Wencke, 783 F.2d 829, 836 (9th Cir. 1986).

I hold, accordingly, that I have jurisdiction to entertain the Receiver's claims against the frozen accounts. However, the issue of jurisdiction does not end the inquiry. I also must consider if the Receiver has standing to bring these claims.

*B. The Receiver's Standing to Bring Claims*

A Receiver acts in a derivative capacity. Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972). Receivers are appointed under the Securities and Exchange Act to carry out the SEC's authority to enjoin violations of the Act and, insofar as possible, to restore to a defrauded entity or to defrauded persons that which was fraudulently diverted from its or their custody and control. Thus, in Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), the Receiver acted to restore to investors the funds that Independence Shares Company had diverted to the Pennsylvania Company. Similarly, in Scholes v. Lehman, 56 F.3d 750

(7th Cir. 1995), the Receiver acted to restore funds that had been diverted from the entity in which creditors had invested. In both those cases, the Receiver had standing, for the benefit of those defrauded to recover fraudulently obtained funds that had come to rest with a non-wrongdoing party. However, in Troelstrup v. Index Futures Group, 130 F.3d 1274 (7th Cir. 1997), the Receiver was not seeking funds, but asserting a cause of action for negligence, not for the entity for which he was appointed, but for investors in that entity. In Troelstrup, the Receiver was appointed to restore Tobin's assets, not to assert a cause of action for negligence based on a duty, not to Tobin, but to Tobin's investors. The Court of Appeals reasoned:

> "The receiver is not trying to build up Tobin's assets. He is suing a third party on behalf of Tobin's creditors to enforce a personal right of theirs, not a right of Tobin's in which they have an interest by virtue of being his creditors." Id. at 1277 (Posner, C.J.)

The Receiver here has asserted claims concerning BJB's status as a lien holder. These are not merely "personal rights" of the creditors. The lien was given by Shiv to BJB, and represents a claim against assets that were controlled by Shiv and wrongfully given by him to BJB in the form of a lien on such assets. Determination of the status of the liens is integral to ascertaining the scope of the fraud, tracing the fraudulently diverted funds, freeing them from wrongful claims, and restoring them to the status they had ante the fraud. Unlike Troelstrup, the Receiver asks this Court to rule on the validity of liens claimed by BJB, he is not simply asserting personal rights of defrauded parties. Rather, he is acting to undo the frauds caused by Shiv with BJB's; alleged involvement and complicity. The Receiver's standing is as implementor of the SEC's role in stopping and undoing Shiv's fraud, the very purpose of the Injunction Order granted by this court.

16

The Receiver here is acting comparably to the receiver in Tcherepnin v. Franz, 485 F.2d 1251, 1255 (7th Cir. 1973). In Tcherepnin, where investors and depositors sued the officers and directors of a bank under the Securities and Exchange Act for diverting invested funds to their own use and benefit, a receiver of the Bank was appointed to bring ancillary claims against corporations that the officers and directors had established to carry out their fraud, and to impress constructive trusts against extensive real estate properties that the officers and directors had caused the corporations to purchase using loans made by the bank. The Court of Appeals held that the action by the receiver sought to accomplish "the ends sought . . . by the suit in which the appointment was made," Tcherepnin v. Franz, 485 F.2d 1251, 1256 (7th Cir. 1973), and upheld the court's jurisdiction and the receiver's standing.

BJB argues, like the trustee of the properties in Tcherepnin unsuccessfully argued, that the Receiver has no standing to sue to defeat its liens. The position of BJB, like the position of the trustee in Tcherepnin, fails if it obtained its liens not in good faith, without fulfilling its duty of "reasonable inquiry as to [Shiv's] actual perimeter of authority." See, e.g., Collision Plan Unlimited, Inc. v. Bankers Trust Co., 63 N.Y.2d 827 (1984); N.Y. U.C.C. §§ 8-105(a)(2), 9-102(43); see also 2A N.Y. Jur.2d Agency § 85 (obligation to inquire scope of agent's authority). Accepting the allegations of the Receivers complaint as true, as I must on this motion by BJB, I hold that the Receiver has standing to ask this court to adjudicate if his right, or BJB's right, is superior. Thus, the Receiver acts to obtain defrauded funds, from where they would otherwise be coming to rest in order to restore them.

This Court gave the Receiver the authority and the mandate to investigate the fraud committed by Shiv, to "secure and protect the assets and property" entrusted to Shiv by customers, and to carry out tasks "with a view to prevent[] loss, damage, and injury to public investors." Prelim. Inj. Order ¶ IX.D. The tracing of improper transfers and liens is integral to his task. If this court has jurisdiction to oversee the investigation necessary for this process and to stop the fraud, the jurisdiction extends to preventing a third party, complicit with Shiv (as alleged), from furthering and extending his frauds. See also SEC v. Cherif, 933 F.2d 403, 406 (7th Cir. 1991) (jurisdiction and receiver's standing extend to recovery of funds in possession of a nominee). The Seventh Circuit Court of Appeals held that the district court "can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them." Id. at 414 n.11. The court, at the very least, has "jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities laws violations." Id. (citing Tcherepnin v. Franz, 485 F.2d 1251 (7th Cir. 1973); SEC v. Wencke, 783 F.2d 829 (9th Cir. 1986), certiorari denied, 479 U.S. 818.).

The Receiver's right to proceed with the unwinding of improper transfers by determining the validity of the liens held by BJB does not impose any unreasonable restrictions on the rights of third-party objectors. Indeed, the regulation of third party claims will be much facilitated by greater knowledge of the status of BJB's claim to be a rightful lien holder. I defer for later consideration whether and to what extent jurisdiction lies in this, or the state court, to regulate the third-party creditors' claims, inter se. Discovery on many of those claims undoubtedly will continue in both state and federal

court. I note in passing that the Ninth Circuit has "rejected the investors' contention that district courts are flatly prohibited from adjudicating in summary post-judgment proceedings the claims of nonparties to property claimed by securities receivers." SEC v. Wencke, 783 F.2d 829, 836 (9th Cir. 1986), certiorari denied, 479 U.S. 818).

## CONCLUSION

For the reasons stated, I hold that I have jurisdiction to hear, and the Receiver has standing to bring, claims to regulate the status of BJB as a lien holder. To that extent, the Receiver's motion is granted. However, for the reasons stated, I decline to reach the merits of Receiver's substantive recommendations at this time with regard to returning funds to each creditor's account and, therefore, I deny the balance of the Receiver's motion without prejudice. All parties in this action will appear for a status conference on August 17, 2005 at 2:30 P.M. in Courtroom 14D, 500 Pearl Street, New York, New York 10007. The parties should be prepared to discuss proceeding first on the issues related to BJB, and second, on the remainder of the Unwind Motion and the Receiver's plan of Equitable Distribution.

SO ORDERED.
Dated: New York, New York
July 29, 2005

ALVIN K. HELLERSTEIN
United States District Judge